May it please the Court. My name is Mark Caldwell. I'm representing Mr. Trego this morning in this Social Security appeal. With the Court's permission, I do intend to reserve two minutes for rebuttal. This case is an opportunity to address two issues that appear in Social Security disability cases frequently. One is the crediting-as-true doctrine, and the other is the reliance upon non-examining State agency physicians who complete assessment forms at the initial and reconsideration stages before the request for hearing is filed. Let me talk about those in that order if I may, and of course, obviously, we'll address any questions the Court may have. The problem with the crediting-as-true doctrine has come about since the case of Conant. And there's an unfortunate sentence in the Conant case where the Court is remanding for further proceedings and declining to remand for payment of benefits. And the sentence is we are not convinced that the crediting-as-true doctrine is mandatory in the Ninth Circuit. Vasquez decided quite recently, says there's a split in authority in the Ninth Circuit citing Conant on the crediting-as-true doctrine. In my Rule 28J letter that I submitted, I argue that that's just not the case. There's not a split in authority, despite the fact that Vasquez says there's a split in authority. Here's what happened in Conant. You know, let me be you don't have much time, and I do have some questions for you. Before we can even get to the credit-as-true rule, invoking that, you need to show us that there was error here. Sure. Right? Yes, absolutely. So you have to establish that the ALJ improperly either discredited the doctor's one of the doctor's testimony, or improperly discredited Mr. Trago's testimony. I think the latter is the appropriate focus. Okay. Now, you need so where did the ALJ go wrong? Let's just talk about Mr. Trago's testimony. Where did the ALJ go wrong in discrediting his testimony? Well, there were six or seven or eight different reasons the ALJ gave, and I discussed them in the brief. Right. Let me just give a couple of examples, okay? Mr. Trago, for example, said, I have severe back pain, and the Court's aware that there were severe findings on the X-rays and whatnot, and that I have to lay down two hours out of a typical eight-hour day, and that I have to change positions every 15 minutes. And the ALJ, again, many reasons were given, none of them substantial, but the one that I think has the most clear legal error was there's no objective evidence to support that he has to do that. He doesn't have to produce objective evidence to support that he has to do that. He has to provide objective evidence of a medically determinable impairment that can reasonably be expected to lead to those symptoms. Right. Well, he did that here, didn't he? He did that, absolutely. With his scoliosis. Severe scoliosis. Right. Yes. Right. And so that is just one of many. But that's not the only matter that the ALJ pointed to. No. She pointed to some statements by the doctors that a couple of times he came in, I think it was, you know, there's a whole host of doctors here, but when he went to visit them, the doctors would ask him, how are you? And he would say, well, I'm okay or I'm feeling fine. He didn't say that. He didn't say that. I'm fine or I'm well or something. He didn't say that. He said I experienced some improvement with Vicodin, some improvement. Here's what's incredibly strange. Did he show up to one of the appointments by riding a bike? Yes, he did. A couple of miles. And he explained that. And even the doctor talked about it. He explained that because of his severe back condition, it's easier to ride a bike than it is to just walk, because walking is a weight-bearing exercise where when you're on your bike, you're not putting your weight on your legs. What's odd about that and what's odd about the comment you made, Judge Paz, about the improvement is he's telling the truth. He's saying that, yes, this is what I do. Yes, I have improvement. And in Reddick v. Shader, this Court noted that talking about improvement is extremely unlikely behavior for somebody who's intent upon exaggerating the extent of their difficulties. Now, the one thing that troubles me about these doctor's reports and the way the ALJ treated them is that, you know, he's seen various doctors for different kinds of conditions, correct?  So he had a heart condition. Yes. And, in fact, he had bypass surgery, right? Triple, yes. And some of the times when he goes to see his cardiologist, he makes these comments about feeling okay. Yes. And there's no discussion about his scoliosis. Exactly. Is that right? Yes. And once more I come back to how strange that is. He's telling the truth. He feels better after he had it. It took him a year to get better, but he feels better after the triple coronary bypass graft. And he's being truthful about it. But that's not his problem. His problem is his back. And that's what he said at the hearing. He said, my number one problem is my back. So why does the fact that somebody is telling the truth about improvement in their coronary condition mean that they're lying about how bad their back hurts? There's just no logic to that whatsoever. We have a man here who's being truthful over and over and over again, and the judge is relying on the fact that he's telling the truth to find that his symptom testimony isn't credible. That's incredible. Right. Now, if we would agree with you that the ALJ improperly discredited his testimony, then it's your position that we should credit as true all of his testimony, and therefore if you take what the vocational expert testified to, there's no way he could do his prior work or any work, and he should just get benefits. That's your position? Yes. I checked before I came over here, and Varney and Reddick and Orn and Lingenfelter, none of those cases have been overruled. All of those cases say that the appropriate remedy in a situation like this, we have vocational expert testimony, that the symptom testimony precludes the ability to perform sustained work is to remand for payment of benefits. I want to add something, coming back to the Connick case, if I may, for a moment. The Connick case relied upon Burns v. Shaleta, B-Y-R-N-E-S. And I represented Jimmy Burns. He died before the agency ruled on his claim upon remand. That's a pretty compelling set of circumstances as to why the crediting-as-true rule is important in these cases. So I think what I want to talk about when I talk about Connick is that Connick did not create a split in authority. Connick simply followed the crediting-as-true rule and found it did not apply. But, you know, all of this, the crediting-as-true rule and whether we remand it back, all gets to the role of the administrative agency vis-a-vis the courts. I mean, we're not supposed to absorb the responsibility and role of the administrative agency. So if there's something that the administrative agency needs to resolve, we have an obligation to send it back. If there is something, and here's the words from Varney, something that must be resolved, must be resolved before a determination of disability can be made. And the question is, is there something that must be resolved? And here there is nothing that must be resolved. Once Mr. Trago's testimony is accepted as true, and once the vocational expert's uncontradicted testimony that that establishes limitations that preclude sustained work, there are no other issues that must be resolved. I see I have my two minutes, and I would like to reserve that with your permission. Roberts. Thank you. Good morning, Your Honors. My name is Leo Montenegro, Counsel for the Appellee, Commissioner of Social Security. Your Honors, of the three issues that have been raised in this case, that is, credibility of claimant's testimony regarding his subjective symptoms, the ALJ's consideration of several significant x-rays, and the ALJ's reliance on Dr. Klayman's support of the ALJ's findings in all three counts, as to the claimant's credibility, the claimant had made equivocal statements about his subjective symptoms, his pain, that is. He had told his doctors, apparently, as the Court has noted, that when asked, he had been feeling well, or that he was doing well, or no serious problems since his bypass graft surgery, although at the same time Let's just take one of these for an example. I found this kind of interesting. For example, I think it's a Dr. Ranoli, Ranola? Raniola, I guess. Ranola, okay, right. So, Mr. Trager went to visit him on March 18th of 2003, correct? He said excerpts of record 195. Yes, Your Honor. Right? And the first paragraph is subjective. The patient is a 56-year-old Caucasian male, seen for a follow-up evaluation. He underwent a CABG in June 2002. He's been doing fairly well, except that he recently had a cold and a bad cough. That fairly well comment gets picked up by the ALJ. Yes, Your Honor. To suggest that overall he's feeling well, that he doesn't have any back pain. But really what's going on here is they're evaluating him with respect to his heart problem. I think that's certainly one way to read it, Your Honor, although- Well, why would you read it any other way? Because Dr. Raniola also said that he was doing fairly well, except that he recently had a cold with a bad cough, which seems to me as being unrelated to his cardiac problems. I think this was just a general statement. Do you think that the doctor was concerned about his scoliosis? At that time, probably not, Your Honor. I would guess there were other doctors- He had been treated for a serious heart problem, correct? Oh, yes. That's why he was being followed up, Your Honor. And that was one of the conditions that the ALJ relied upon as showing that he had suffered- that he had a documented impairment, a severe impairment, was his heart condition. Yes, Your Honor. Dr. Raniola was only one of several doctors who said something along those lines about his- Let me ask you this. It's your position that it would be a reasonable inference to take from this little statement from a cardiologist who is evaluating his overall heart condition. It would be a reasonable inference that that statement was referring to scoliosis. I think it would be a reasonable inference, Your Honor, that it refers to a claimant's overall condition, especially in the context of what was said to other- or what claimants said to other doctors as well, what other doctors reported. So other doctors who were aware of claimant scoliosis, or at least specifically reported on that, said something similar. Dr. DeYoung, who had examined claimant overall in connection with his disability claim reported, by his own- quote, unquote, by his own admission, he, claimant, indicates that he has been doing pretty well since that time. That is, since his bypass graft surgery. He indicates that he has always had a little shortness of breath for most of his life. When it comes to claimants- Well, that doesn't have anything to do with his back pain. Dr. DeYoung, when he examined him for lower lumbar pain, mentions that Trego describes as 10 out of 10 the pain that he suffers if he exerts himself at all. And that he mentions- He, Dr. Young, mentions that the degenerative disc disease and the scoliosis are causing him a lot of pain. Yes, Your Honor. Dr. DeYoung reported that according to claimant, generally at rest he has pain that is about 2 or 3 out of 10 on the pain scale. And that when he exerts himself, if he overexerts himself, that is, it's 10 out of 10. The low lumbar pain is, claimant reported, as 10 out of 10. So generally, at rest, it's 2 or 3 out of 10 on the pain scale. So what does at rest mean? I think it just means the common meaning of at rest. He's not moving, he's not, at least in the context of this paragraph, he's not overexerting himself, Your Honor. No. At rest doesn't mean overexerting. At rest could mean the lying down for two hours, couldn't it? It could mean that, Your Honor, although I think it's subject to some interpretation. It could simply mean sitting still or not moving. He is at rest as opposed to not moving. But I'm just speculating. His testimony is that he can't either sit still or stand for more than 15 minutes. Yes, Your Honor. The doctor's statements themselves are only one element of the ALJ's credibility finding and also in the record, as has been noted. Yes, Your Honor. It's a pretty important one. If you're relying on Dr. Burris, who didn't examine him, checked boxes on the form, and the ALJ relies on that to discredit what was said with Dr. Young. And also Dr. Rahan, who said he had a lot of low back pain. Yes, Your Honor. Dr. Burris, the state agency physician, was the only doctor to give a comprehensive opinion. But he did a medical review, correct? That's true, Your Honor. He did a record review. Yes. Based largely, it appears, on Dr. de Young's reports, which Dr. Burris cites extensively and summarizes in his form report. Apart from Dr. Burris's opinion, the ALJ noted that Dr. Burris's opinion was consistent with Dr. de Young's and Dr. Raniola's. As to claimant's credibility, that is, as to his ability to... Why was it consistent with Dr. Raniola's? I'm sorry, Your Honor? What's the consistency with Raniola's? I think it was... Comment about being well or whatever, fairly well? Yes, Your Honor. One of the original allegations the claimant made was being disabled by his heart problems. And his heart problems have resolved. I don't think anyone at this point contests that. Although, earlier on in the application process, that was one of the bases for his alleged disability. And the fact that... Did he have his heart surgery before he filed for benefits or after he filed for benefits? I think it was... I'm sorry, it was before he filed for benefits. But he was still having problems, wasn't he? He was still being followed up for his heart problems, but it was my impression that after his surgery in June of 2002, he was being followed up just to make sure nothing recurred, there were no continuing problems. But the medical evidence suggested that the surgery went fine and claimant, by his own admission, as Dr. de Young said, was doing fine. And there's nothing in the evidence to suggest he has continuing heart problems. As to... Again, as to claim... Let me ask you this. Suppose we disagree with you and we say that the ALJ improperly discredited the claimant's testimony. What do we do? Well, Your Honor, I think that that would be... As claimant argues, then you would be accepting the claimant's testimony over the opinion of Dr. Burris. And the claimant's testimony, which... You would just be saying that substantial evidence does not support the ALJ's determination to discredit Mr. Trago. But I'm asking, if we were to do that... I'm not saying we are, I'm just saying if we do, I'm just trying to think this through. What's your position on what we should do at that point? Well, I think on this record, Your Honor, frankly, it appears that the vocational expert, at least based on claimant's alleged limitations, said the claimant couldn't work. And if you rely on those limitations, as characterized by, I believe it was, claimant's attorney and the claimant and the vocational expert's testimony and response, that claimant is disabled. But I would say that, on this record, claimant's own statements, which are largely reproduced by his treating physician at the time, Dr. Rajan, Dr. Rajan's reports are equivocal in and of themselves and suggest that Dr. Rajan didn't actually credit claimant's testimony at face value. Because Dr. Rajan mentioned a couple of times that claimant, as was noted, rode his bike to his medical appointment four miles. At another point, he commented, and this is while claimant was telling Dr. Rajan that he couldn't sit or stand for very long and that he had knee pain. At another point, he had walked a mile and a half in 102-degree weather to his medical appointment. And apart from that, claimant also testified that he rode his bike once or twice a week to go grocery shopping. Those kinds of activities, especially those... How do those all relate to his work? Well, claimant, if they don't relate directly to his work, they relate to his claims concerning his functional limitations, specifically his ability to sit and stand for extended periods or his alleged inability to sit and stand for extended periods or to walk for extended periods. Dr. Rajan was recounting those complaints while at the same time in those same reports, noting that claimant had ridden his bike four miles or had walked one and a half miles in 102-degree weather. Your Honor, for those reasons, I think that the ALJ's decision was supported by substantial evidence. The credibility findings should stand. Thank you. Thank you, Your Honor. Mr. Montenegro. I'm sorry, Mr. Caldwell. I have the luxury of sitting back there and being able to look things up while Mr. Montenegro is arguing, so I can answer your question. The application was in August of 2004 and the bypass grab was in June of 2002. So he had the bypass grab long before he applied for disability benefits based on his back. But when he applied for benefits, he listed his heart condition. He did. Because that's one of the impairments that the ALJ relied upon at the first step. Sure. He listed that. He listed his diabetes. And, you know, I'm not going to argue that his diabetes didn't come under better control. It did. That's another thing that I found odd about the ALJ decision. You know, they're sort of castigating him because he's not doing things to take care of himself. One of the reasons he's found not credible is he lost weight. You're supposed to lose weight if you have diabetes. You know, it's sort of like you're condemned if you do and you're condemned if you don't. There was some mention of Dr. Raniolo's, excuse me, Dr. Burris's opinion. And I just want to bring the Court's attention to page 227 of the excerpts of record. This is that non-examining State agency doctor's opinion. And you'll note the handwriting in which it is filled out matches the handwriting of the person who completed the form the day before Dr. Burris signed it. It's pretty clear Dr. Burris did not complete this form. He merely signed off on it and somebody else completed it with an illegible initial here.  the only thing that this doctor talks about is lumbosacral X-ray, DDD, degenerative disc disease. He's not talking about the marked scoliosis from which this gentleman suffers. So this is a selective analysis of the evidence under any interpretation of what we're looking at here. The last thing I want to mention Is that the sole report? Is that one page? No, no. This is the last page of the State agency form, Judge. But the prior forms are merely check marks on a box. This is the only analysis, if you would, of what actually the doctor purportedly looked at. But as I say, I don't think this is the doctor. His signature's at the bottom. But the day before, somebody else filled this out and initialed it. So there's no credible argument that this is, in fact, what the doctor himself filled out. Oh, I see. This initial down here on 1021. Yes, exactly. And then Dr. Burris's signature is here on 1022. Well, you know, Dr. Burris could have looked over it. He could have, possibly. But it's not compelling evidence that he's the one who filled out the form, I don't think. Can I have just 10 seconds to finish up? Yes. The question you asked me, Judge Paez, was, well, you know, we're not supposed to make agency decisions. And that's true, generally speaking. But I would like to point out that Congress in 42 U.S.C. 405G specifically gave courts power to remand with or without a further hearing. So there's specific statutory authority that allows that. And my time is way up. Thank you very much. Thank you very much. And we appreciate both arguments. And the matter is submitted at this time.
judges: Carney, Hug, Paez